Herman Levy, et al. [1] v. Commissioner. Levy v. Commissioner
Docket Nos. 58758-58760.
United States Tax Court
T.C. Memo 1960-22; 1960 Tax Ct. Memo LEXIS 266; 19 T.C.M. (CCH) 120; T.C.M. (RIA) 60022; February 19, 1960
Aaron Holman, Esq., for petitioners. Charles B. Markham, Esq., for respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in the income tax of petitioners Netley Service Corporation and Herman Levy as transferee of its assets for the taxable year 1949, and of Herman and Nettie Levy for the taxable year 1950 in the following amounts: Docket
No.
Year
Deficiency
58759
Netley Service Corporation
1949
$35,690.60
58758
Herman Levy
1949
35,690.60
58760
Herman and Nettie Levy
1950
14,436.86 These deficiencies, insofar as they are herein contested, *267 result first from respondent's determination (in Docket No. 58759) that additional income was realized by Netley Service Corporation in 1949 from the cancellation in that year of indebtedness for unpaid rentals in excess of $2,350,000 which rendered the corporation solvent to the extent of $95,325.52, and were taxable to it in the latter amount, and (in Docket No. 58758) that Herman Levy as transferee of the assets of Netley Service Corporation at least to the extent of $95,325.52 was liable for that tax. Second, the deficiencies result (in Docket No. 58760) from respondent's determination that Herman and Nettie Levy realized a long-term capital gain of $89,640.97 from the liquidation in 1950 of Netley Service Corporation. In the statement attached to the deficiency notice addressed to the petitioner corporation respondent explains that part of the deficiency here at issue is as follows: "(c) Income reported in your return for the year 1949, has been increased $95,325.52 to reflect the additional income realized by you from the cancellation in that year of your indebtedness for unpaid rentals in excess of $2,350,000.00. In making this adjustment it has been determined that the *268 pre-existing condition of insolvency in your affairs was changed by the stated cancellation to a condition of solvency in which assets, including "Loans Receivable" from Herman Levy at a value of $93,993.43, exceeded liabilities by $95,325.52." The allegations of error in the corporation's petition are as follows: "(a) The Commissioner erred, in his determination that the petitioner realized income in the amount of $95,325.52 on the cancellation of an indebtedness for unpaid rentals in excess of $2,350,000 upon the theory that petitioner became solvent in the amount of said increased income as the result of said cancellation of indebtedness. "(b) The Commissioner erred in determining that the aforesaid cancellation of indebtedness created a condition of solvency upon the theory that a book asset consisting of loans receivable from Herman Levy had a value of $93,993.43." In Docket No. 58758 (the transferee case) Herman's petition contains similar allegations of error and also a general allegation that respondent erred in determining that Herman was a transferee of the corporation. In Docket No. 58760 petitioners allege that respondent erred in making the adjustment explained *269 by him in the statement attached to the deficiency notice as follows: (a) It is held that you realized a long term capital gain of $89,640.97 from the liquidation in 1950, of Netley Service Corporation, computed as shown below: Cash received from Netley Service Corporation bank account
$ 547.54
Furniture and Equipment
100.00
Loans receivable account, Herman Levy
93,993.43
$94,640.97
Brought forward
$94,640.97
Less: Cost of stock
5,000.00
Total gain
$89,640.97
50% taken into account
$44,830.49
Findings of Fact Some of the relevant facts were the subject of a stipulation by the parties. The facts so stipulated and the exhibits attached thereto are made a part of our findings by this reference. Herman and Nettie Levy are husband and wife, hereinafter sometimes referred to as "Herman" and "Nettie," residing at 25 Elizabeth Road, New Rochelle, New York. They filed a joint Federal income tax return for the taxable year 1950 with the collector of internal revenue for the third district of New York. Netley Service Corporation, hereinafter sometimes referred to as "the corporation," was organized under the laws of the State of New York in January 1928, *270 having its principal office at 132 Nassau Street, New York, New York. It was formed for the purpose of engaging in the business of subleasing office space. It filed a corporate income tax return for the calendar year 1949 (the taxable year in issue insofar as the corporation is concerned) with the collector of internal revenue for the third district of New York. The authorized capital stock of the corporation upon its organization was $5,000. Nettie paid $5,000 in cash to the corporation. She received 50 shares of stock. An additional 50 shares of stock were issued to Joseph D. Siskind, Nettie's father, upon the organization of the corporation pursuant to an agreement dated January 3, 1928, between Siskind, Herman as president of the petitioner corporation, and another corporation whereby certain chattels, including furniture and fixtures owned by the other corporation but mortgaged to Siskind, were transferred to the corporation and the mortgage canceled. These chattels had an agreed value of $11,000, and because the chattel mortgage indebtedness of the other corporation to Siskind exceeded that amount the other corporation had no remaining equity in the chattels. Siskind assigned *271 the 50 shares of petitioner corporation's stock to Nettie on the same day he received them. Nettie remained the sole shareholder of the corporation until she made a gift of all her shares to Herman on October 14, 1936. Since that date and at all times relevant thereafter Herman was the sole shareholder of the corporation. His basis with regard to this stock was $16,000. The operations of the corporation consisted of renting entire floors in office buildings in midtown Manhattan, dividing the space into suitable office areas, subleasing small furnished offices, and making available secretarial services and general office help, including telephone-answering service, to the tenants. During 1928 and subsequent years the corporation rented floor space in buildings known as Salmon Tower Building at 11 West 42d Street, New York City, owned by 11 West 42d Street, Inc., and the Bryant Park Building at 55 West 42d Street, New York City, owned by Bryant Park Building, Inc. Although the buildings were owned by these two corporations, Walter J. Salmon controlled them and it was with Salmon that Herman, as president of the taxpayer corporation since its organization, *272 negotiated concerning the leases of office space in the buildings owned by Salmon's two corporations. Shortly after the petitioner corporation was organized in 1928 Herman negotiated a lease of one entire floor in the Bryant Park Building. The initial operations were successful and other floors were rented both in that building and in the new Salmon Tower Building located nearby. Soon the corporation was lessee and sublessor of six floors in the Bryant Park Building and four floors inthe Salmon Tower Building. Following the stock market crash in 1929 business worsened for the corporation. In 1931 Herman went to Salmon and advised him that the corporation's business situation was hopeless, high-rent tenants were moving out, and office space was not being rented. Herman declared that the only course open to the corporation was the filing of a petition in bankruptcy. On the suggestion of Salmon, Herman and he agreed orally that the corporation would henceforth pay its lessors 75 per cent of all the rents which it collected and retain 25 per cent for operating expenses and salaries during the period of depressed business conditions. It was agreed that the corporation would carry the *273 unpaid rent due the lessor corporations (i.e., the difference between 75 per cent of the rent collected from the sublessees and the fixed rentals incorporated in the leases of floors in the two buildings) on its books as accounts payable, that no payment would be required of that difference until the depression ended, and that an adjustment in the accounts between the lessors and the corporation would take place when business improved. The corporation and its lessors continued to operate under this oral understanding from 1931 until 1943. The corporation paid 75 per cent of its gross rental receipts to its lessors (Salmon's corporations) in each year during this period. The lessors maintained close supervisory inspection of the operations and receipts of the taxpayer corporation. Following is a schedule of unpaid rents to the lessors which were accrued on the corporation's books from 1931 to 1943, inclusive: Year
Amount
1931
$ 162,144.49
1932
210,237.87
1933
248,562.43
1934
243,732.17
1935
249,514.23
1936
242,834.45
1937
103,906.45
1938
182,290.80
1939
180,047.00
1940
177,327.93
1941
149,964.54
1942
139,508.34
1943
94,952.98
Total
$2,385,023.68
*274 At some time in 1943 Herman and Salmon discussed the 75 per cent arrangement in the light of changed and improved business situations and conditions. Salmon indicated that the lessors of the floor space might want to repossess some of the leased area, in the Salmon Tower Building in particular. He also declared that further accumulations on the corporation's books in the form of accrued rents over the 75 per cent figure would not be made, and attempted to dispel any concern of Herman's with regard to the accumulations from 1931 to 1943. He, however, suggested to Herman that he limit his borrowings from the corporation to the amount of his salary. Herman personally was guarantor of all rental payments specified in the leases which he negotiated on behalf of the corporation with its lessors. In 1945 Salmon asked Herman to sign a demand note on behalf of the corporation for a large part of the amount of the accrued rent accumulated on the books of the corporation. Herman not only acceded to Salmon's request, signing the note, but also endorsed it as guarantor of the rental payments under the leases. On or about December 24, 1947, the lessor corporations, 11 West 42d *275 Street, Inc., and Bryant Park Building, Inc., instituted civil actions against the corporation and Herman in the Supreme Court of the State of New York for the recovery of a total amount in excess of $2,000,000 representing alleged unpaid rents under leases in effect from 1931 to 1943. The defendants actively contested the litigation on the merits, alleging that the corporation was never indebted to the lessor corporations for any unpaid rents, that the note signed in 1945 was not intended to represent a valid obligation of the maker and endorser, and that both the note and a statement of account between the parties had been obtained from defendants on the false and fradulent representation by the lessors that the lessors would never bring suit thereon but only wanted the note for purposes of taxation and facilitating eviction. Before the final determination of this litigation the parties thereto reached a settlement on April 22, 1949. As part of this settlement the corporation surrendered to Bryant Leasing Co., Inc., for valuable consideration, the premises at 55 West 42d Street (the Bryant Park Building) and all estate and rights it held under leases from Bryant Park *276 Building, Inc. The taxpayer corporation and Herman, Salmon, and four corporations in which Salmon had an interest entered into an agreement whereby the taxpayer corporation on one hand and the four corporations on the other hand, namely, 11 West 42d Street, Inc., Bryant Park Building, Inc., Bryant Service Company, Inc., and Bryant Leasing Co., Inc., exchanged general releases. It was agreed that the corporation would retain only certain furniture located in the surrendered and vacated premises, consisting of a desk, hatrack, two occasional chairs, five paintings, a desk chair, two typewriters, a stationery cabinet, a teakwood table, a small table, three lamps, a screen, three ashtrays, an inkwell, a radio, a fan, three rugs, three pairs of drapes, two venetian blinds, two ventilators, and a towel cabinet. The corporation agreed to transfer simultaneously with the execution of the agreement $9,334.17 in cash or by certified check to Bryant Leasing Co., Inc., and acknowledged that it had previously vacated 55 West 42d Street and had transferred the keys to Bryant Leasing Co., Inc.The corporation and Herman agreed to restrictions upon their business activities *277 with regard to the vacated and surrendered premises and with regard to certain employment relationships. In addition to the transfer of cash, the agreement provided for assignment by the corporation of all claims for rent against former subtenants or subtenants in possession of the 55 West 42d Street premises to Bryant Leasing Co., Inc.; for the delivery by the corporation of all books and records relating to its subleasing operations; and for the retention by the corporation of the account books of the corporation for 6 years. The corporation also agreed to deliver simultaneoulsy to Bryant Leasing Co., Inc., an affidavit stating that it had "no claims for rent, damages or for any other sums against any of its former tenants arising out of any leases or agreements between the [corporation] and any of its said former tenants for space at the premises known as and situate at No. 11 West 42d Street * * *." At the time of the settlement and surrender agreements of April 22, 1949, the books of the corporation showed an accumulated indebtedness of $2,355,735.40 to its lessors. At the same time these books showed loans receivable due from Herman in the amount *278 of $156,633. Prior to this settlement the corporation had a surplus deficit of $2,202,770.31. Between 1931 and 1947 Herman made withdrawals from the corporation almost yearly which were charged to his loan account as follows: Year
Amounts
1931
$ 2,409.28
1932
1,455.00
1933
3,220.00
1934
$ 1,373.65
1935
234.12
1936
577.32
1937
(6.08)
1938
2,919.72
1939
3,616.40
1940
9,244.54
1941
10,492.43
1942
14,997.46
1943
12,301.20
1944
32,410.14
1945
17,375.57
1946
35,162.25
1947
11,500.00 These withdrawals amounted to the sum of $159,283. The withdrawal account decreased to $156,633 at the time of the settlement on April 22, 1949, and to $149,054.52 by December 31, 1949. No repayments have since been made by Herman. Immediately after the April 22, 1949, settlement the books of the corporation showed assets and liabilities as follows: Assets
Cash - Corn Exchange Bank
$ 1,143.57
Loans Receivable from Herman Levy
156,633.00
Furniture and Fixtures
125.00
Due from New York Unemployment Insurance
63.52
Total Assets
$157,965.09
Liabilities
None
The corporation has been inactive ever since the settlement and surrender *279 of April 22, 1949. It was not formally dissolved. However, it disbursed all of its remaining funds in 1950 and closed its account in the Corn Exchange Bank on February 17, 1950. The following is a chronology of the final disbursements and bank-account closing of the corporation as reflected in a record of its cash transactions for 1950: Jan. 1, 1950
Balance
$1,019.11
1950
Receipts
0
1950
Payments: -
$1,019.11
Jan. 10, 1950
N. Y. Tel. Co.
$ 10.78
11, 1950
Coll. of Int. Rev. - With. Tax 1949
190.40
23, 1950
Cash - Misc. Expenses
25.00
23, 1950
H. Levy Loan Acct.
100.00
26, 1950
Harris Newmark & Co. - Rent
50.00
26, 1950
Harris Newmark & Co. - Light
.73
30, 1950
Kay Clark - Misc. Expense
15.00
Feb. 8, 1950
H. Levy Loan Acct.
150.00
10, 1950
Lewis Advertising Co.
24.32
17, 1950
N. Y. Franchise Tax
155.34
17, 1950
H. Levy Loan Acct.
297.54
Total Payments
1,019.11
Feb. 17, 1950
Balance - Acct. Closed
$0 Furniture owned by the corporation of the value of $100 was appropriated by Herman for use in a new business which he initiated in 1950. A summary of all receipts by Herman from the corporation in the years *280 1928 through 1949 is as follows: Total
Receipts
Year
Salary
Tax Deducted
Loans
(Net)
1928
$ 3,100.00
$ 3,100.00
1929
4,300.00
4,300.00
1930
4,130.00
4,130.00
1931
2,080.00
$ 2,409.28
4,489.28
1932
2,040.00
1,455.00
3,495.00
1933
3,710.00
3,220.00
6,930.00
1934
6,600.00
1,373.65
7,973.65
1935
5,900.00
234.12
6,134.12
1936
6,000.00
577.32
6,577.32
1937
6,700.00
(6.08)
6,693.92
1938
10,000.00
2,919.72
12,919.72
1939
9,400.00
3,616.40
13,016.40
1940
5,200.00
9,244.54
14,444.54
1941
5,200.00
10,492.43
15,692.43
1942
5,200.00
14,997.46
20,197.46
1943
5,200.00
($ 508.30)
12,301.20
16,992.90
1944
5,200.00
( 790.40)
32,410.14
36,819.74
1945
7,400.00
(1,402.20)
17,375.57
23,373.37
1946
20,800.00
(3,415.60)
35,162.25
52,546.65
1947
20,000.00
(3,352.00)
11,500.00
28,148.00
1948
14,800.00
(2,161.00)
12,639.00
1949 to 4/30
7,800.00
( 707.20)
(2,650.00)
4,442.80
$160,760.00
($12,336.70)
$156,633.00
$305,056.30
5/1/49-12/31/49
7,578.48
Reduced
12/31/49 Balance
$149,054.52
The corporation paid no New York *281 franchise taxes after 1950. No formal action has ever been taken with respect to the withdrawals of Herman, which constituted a bona fide enforceable indebtedness to the corporation and which remained recorded on the books of the corporation. Of the total net receipts from the corporation by Herman from 1928 through 1949 of $305,056.30, he expended $249,714.02 during the period 1938 through 1949. Among the assets purchased with these receipts were the following: Date of
Item
Amount
Purchase
House in New Rochelle
$30,000.00
1946
Automobile
2,825.00
1947
Jewelry
1,100.00
1945
Mink Coat
3,550.00
1944
Furniture
27,890.06
1938-1949
Total
$65,365.06
The amount of $27,890.06 expended for furniture included the money used for the purchase of furnishings for an apartment at 20 Plaza Street, Brooklyn, New York, and for a house at 25 Elizabeth Road, New Rochelle, New York, as well as approximately $8,000 for furniture which was given to Herman and Nettie's daughter, Edna, in 1942, 1944, and 1945 after her marriage in 1942. Of the amount expended for furniture, $3,009.19 was expended in 1938 while the balance was expended in the years 1943 to 1949, *282 inclusive. Domestic difficulties caused the separation of Edna and her husband in late 1945. Edna moved into the 3-room apartment at 20 Plaza Street which her parents had rented and occupied since 1943, when, because of Edna's marriage, they sold their house at 1375 Mansfield Place, Brooklyn, New York. Edna had one child and was expecting a second at the time she moved into her parent's apartment. It became necessary to obtain larger living accommodations for the family group. The possibility of buying several houses was discussed. Nettie and Edna went to Florida to rest from the turmoil of the domestic crisis and Herman remained in New York with the burden of choosing a house and negotiating for its purchase. He negotiated the purchase of the house at 25 Elizabeth Road, New Rochelle, New York, put a "binder" of $300 on the deal, and sent his wife a wire on March 10, 1946, which read as follows: "YOU OWN BEAUTIFUL HOUSE AND GROUNDS ONE HUNDRED BY ONE HUNDRED POSSESSION MAY TENTH MAIL ME CHECK TWENTY SEVEN HUNDRED TO CHARLOTTE SAYLE HESSER LETTER FOLLOWS." The purchase price of the house was $30,000. Nettie paid $2,700 to the seller of the New Rochelle house by means of her personal *283 check dated March 11, 1946, made payable to the seller and $27,000 by means of her personal check dated May 9, 1946, made payable to herself and endorsed over to the seller. The deed to the New Rochelle house was taken in the name of Nettie. The funds with which the purchase was made were supplied by Herman from receipts from the corporation which were charged to the corporate account entitled "Herman Levy Loan Account." At the time Nettie accepted the $30,000 from Herman with which she paid for the New Rochelle house, Herman was personally insolvent. During the years 1946, 1947, and 1948 Herman used receipts from the corporation to purchase furniture for the house. The furniture which Herman had purchased for his daughter Edna, along with other of Edna's possessions, was stored between the time she returned to her parents' home - the apartment at 20 Plaza Street - in late 1945 and mid-1946 when she, her family, and parents moved to New Rochelle, at which time the furniture was used in the New Rochelle house. In 1948 Nettie gave to Edna a mortgage in the amount of $18,000 on the New Rochelle house. As part of this transaction Edna gave Nettie cash in the amount of $8,000 of her own *284 money and a document purporting to be a bill of sale of furniture the value of which was recited to be in the amount of $10,000. The furniture listed therein included that which Edna had been given while living with her husband and which had been used in the New Rochelle house since she, her family, and her parents moved to New Rochelle in 1946. In addition to this furniture were other possessions including wedding presents and paintings given her by her grandfather. This mortgage transaction was effected under the representation by Nettie that she needed cash and at a time subsequent to the filing of suit by the lessor-creditors of the corporation against the corporation in December 1947. In 1947 Nettie purchased an automobile for $2,825, paying for it with a check drawn on her personal bank account. Title to the automobile was held in Nettie's name; it was owned by her in 1949, and it was the only automobile owned by either Herman or Nettie at that time. Herman gave Nettie the money to finance the purchase not only of the New Rochelle house but also of the furniture, the automobile, the mink coat purchased in 1944, and the jewelry purchased in 1945. Herman transferred funds to *285 Nettie from time to time which she deposited in her bank account; when she expended money for the car, the household items, the mink coat, the jewelry, and the house she drew checks on this account, and insofar as possible placed in herself the indicia of ownership. Nettie had absolute discretion as to the purchases of minor household items. As to major items she would consult with Herman when their purchase was contemplated. On the date of the settlement agreement between the corporation and its lessors, and also in 1950, Herman owned life insurance policies having cash surrender value of $33,578.43, encumbered by a $5,000 loan. Nettie was the owner of a business called Columbia Commercial School prior to her marriage to Herman. She accumulated approximately $16,000 from both the operations and sale of that business. During 1928 and 1929, as an employee of the corporation, she was paid salaries of $10,475 and $12,500, respectively. She received $12,000 from the sale of the house on Mansfield Place, Brooklyn, New York, in 1943. By means of occasional payments between 1929 and 1949 Nettie transferred a total sum of $51,999.20 to Herman. These payments were characterized as "loans" *286 in a statement of Herman's liabilities as of April 30, 1949, which were listed as follows: Liabilities
Loans Payable to Nettie Levy: - Oct. 14, 1930
Loan re
Burgundy
Realty Co. transaction
$17,500.00
Aug. 1931
Loan re Hoffman Bldg. Co. transaction
5,000.00
Aug. 1929
Loan re 6 E. 46th St. transaction
750.00
Aug. 1929
Loan re 45 W. 45th St. transaction
$ 450.00
1929
Loan re Repayment of Insurance Loans
1,500.00
1937
Loan re Annuity Insurance Cost
10,298.00
Mar. 1940
Loan re Annuity Insurance Cost
3,500.60 *
Mar. 1941
Loan re Annuity Insurance Cost
3,500.60 *
July 9, 1947
Loan re Netley Service
2,000.00
May 17, 1948
Loan re Netley Service
4,000.00
June 13, 1948
Loan re Netley Service
3,500.00
Total Liabilities
$51,999.20 Herman gave Nettie no evidence of an indebtedness with regard to any of these transfers to him; he paid no interest on the sums transferred; he repaid no sums as the reduction of a "debt"; and Nettie demanded no repayment. The transfer *287 of $17,500 made by Nettie in regard to the Burgundy Realty Corporation in 1930 was for the purpose of enabling Herman to make available to a separate corporation formed and headed by him funds needed for a contemplated business deal. After receiving the sum of money from Nettie, Herman transferred it in turn to that separate corporation. The transfer of $5,000 by Nettie to Herman in 1931 with regard to the Hoffman Building was for the purpose of enabling another separate corporation which he formed to undertake a business deal. The transfers to Herman by Nettie in 1937, 1940, and 1941 in the respective amounts of $10,298, $3,500.60, and $3,500.60 were for the purpose of enabling Herman to purchase an annuity contract. The checks were drawn on Nettie's bank account. She was under the mistaken impression that the policy provided her with additional insurance protection, that the policy was hers, and that she was the owner. She was the beneficiary of the annuity policy and was of the opinion that she would receive the $92 monthly payment. The transfer of $2,000 to Herman in July 1947 was made in the form of a check to Herman which was immediately endorsed by him over to the corporation. *288 The transfers in May and June 1948 were of the cash proceeds of the mortgage which Nettie received from Edna. Nettie wrote checks in the respective amounts of $4,000 and $3,500 payable to Herman, who immediately endorsed them over to the corporation. The corporation was then engaged in litigation with its lessors and it used these funds to pay off current liabilities. Herman has never been adjudicated to be bankrupt and has never filed a petition in bankruptcy. The transfers by Nettie to Herman were intrafamily donative transfers and did not constitute bona fide loans. Aside from his loans payable to the corporation, Herman had no personal liabilities outstanding on April 22, 1949, or in 1950. The indebtedness of Herman to the corporation on April 22, 1949, was collectible as of that date, and as of December 31, 1949, to the extent of $60,000. The following is a summary of the rent accrued by the corporation in each of the years 1931 through 1943, the losses of the corporation as reported in its income tax returns, and the profits (or losses) it would have shown if the accrued rents had not been deducted: Rent Accrued
Loss per
Profits
Year
But Not Paid
Tax Return
(or Losses)
1931
$ 162,144.49
($ 209,784.22)
($ 47,639.73)
1932
210,237.87
( 143,516.26)
66,721.61
1933
248,562.43
( 251,053.25)
( 2,490.82)
1934
243,732.17
( 249,527.99)
( 5,795.82
1935
249,514.23
( 254,805.03)
( 5,290.80)
1936
242,834.45
( 248,340.40)
( 5,505.95)
1937
103,906.45
( 184,414.57)
( 80,508.12)
1938
182,290.80
( 184,569.47)
( 2,278.67)
1939
180,047.00
( 179,376.51)
670.49
1940
177,327.93
( 170,478.55)
6,849.38
1941
149,964.54
( 134,091.04)
15,873.50
1942
139,508.34
( 125,845.18)
13,663.16
1943
94,952.98
( 77,250.28)
17,702.70
$2,385,023.68
($2,413,052.75)
($ 28,029.07)
*289 The corporation was liquidated during the period January 1 through February 17, 1950. Opinion KERN, Judge: In spite of the fact that the allegations of error in the petitions filed by the corporation and by its alleged transferee, Herman, raise no issue as to the reality of the indebtedness canceled in 1949 but indeed assume a cancellation of an indebtedness, these petitioners on brief strenuously argue that there was no actual indebtedness of the corporation which was canceled and therefore no tax liability of the alleged transferor arising from the cancellation of any debt. This argument was foreshadowed by one sentence in the opening statement of petitioners' counsel at the trial of these cases and some testimony given by Herman without objection by respondent. Assuming, without deciding, that this issue is properly before us, cf. Theatre Concessions, Inc., 29 T.C. 754, we are of the opinion that the corporate petitioner has not borne its burden of proving that there was not in reality the cancellation of a debt in 1949. This debt (which represented unpaid portions of rentals which the corporate petitioner had bound itself to pay) had been carried as an accrued *290 liability on its books for years, and its periodic accrual of such rental obligation had resulted in its tax advantage in 13 years. A few years later and after a new arrangement had been made with its lessors with regard to rentals, the corporate petitioner executed a demand promissory note to its lessor representing a large part of the unpaid accrued rentals. As against these facts of record indicating the existence of a valid debt, the only evidence adduced by petitioners was the testimony of petitioner Herman, the president, sole stockholder, and alleged transferee of the petitioner corporation, which was as follows: "When the stock market crash came, I went to Mr. Salmon [the controlling officer of the lessor corporation] and I said, 'The bottom dropped out of our place like it did in all other places.' I told him, 'Of course I am licked. I can't meet the rental and it is impossible to proceed.' I said the high rent tenants were moving out and I wasn't getting the tenants and there was nothing for me to do but to file a petition in bankruptcy like all the other real estate men had been doing. I said it was hopeless. "He said, 'I know; I know all bout it.' He said, 'You *291 just do your knitting, take it easy.' He said, 'I will take care of you. This can't last too long. During that period,' he says, 'whatever you do will be just as profitable to you as if it never existed.' "He said, 'I will tell you what I will do to see if it is a practical thing and I will hear what you have to say. Supposing we operate on a percentage basis. You give me 75 percent of all rents which you collect, retaining 25 percent for running expenses, salary and so forth.' That was probably the only way I could operate. "He said, 'You go ahead.' I said, 'what will we do on the books about the difference? I have all these leases signed.' "He said, 'Don't worry about that, just as soon as this depression is over, we will adjust that. You won't owe me anything. In the meantime do your knitting and do your renting and forget about bankruptcies and anything else. There will come a time when we will wipe off these debts.' "I said, 'These paper debts, though, are accumulating to probably a hundred thousand dollars or a hundred-fifth thousand dollars a year, more than that.' "He says, 'We will take care of that and eliminate it just as soon as this depression is over.' "Q. *292 Did you proceed from that time on to carry out that oral agreement that you had with Mr. Salmon? "A. I did. "Q. You paid Mr. Salmon 75 percent of your gross rentals as they came in? "A. Daily. "Q. Until when did you do that? "A. Well, we kept that going, I think, from about 1931 or 1932, to about 1944. "Q. Exhibit 3-C of the stipulation, which has been introduced in evidence in the case, shows that you began to accumulate these unpaid rents in accordance with the lease in 1931? "A. That is about right. "Q. And that it continued until about 1943? * * *
"A. Evidently. It looks like it. "Q. Did you have any discussion with Salmon in 1943 which led to the discontinuance of that practice? "A. In fact, he called me. He said, 'Now things are on the upgrade now. Everything is improving. I would like you to give up some of the space that you now hold in the Salmon Tower Building - in fact, all of it - and keep yourself into the Bryant Building.' That is 55 West 42nd Street. "He said, 'We will eliminate this percentage basis, carrying a paper debt over and above that 75 percent.' He said, 'That will be considered payment of rent from this period on, the 75 percent. *293 There will be no accumulation.' "I asked him what happened to the accumulation I have now. "I said, 'I thought we had an understanding.' He said, 'What are you worrying about? I am not bothering you. You are drawing a salary. You are making loans. I am the only one that you owe on the books.' "He said, 'I am the only one you owe.' "I said, 'That is a paper debt.' "He said, 'Yes, but you owe nobody else. If you borrow it from me, that is O.K., if you don't go too high on that. Limit your borrowing to about the amount of your salaries because you are insolvent and you can't draw too much salary.' "I think it was towards 1945 when he asked me to sign a demand note for the entire amount. He said, 'The reason I want you to do that is because if I want possession of the premises, we are working' - I don't recall whether we were working on or we already passed the rent laws - he said, 'If I don't have something that I can get you out if necessary', he said, 'you become a statutory tenant and I won't be able to do anything.' "That was the reason for the demand note. 'You have a tax problem - everything will be all right. Just run your books as they are,' he said. 'I am not asking *294 you for anything.' "Q. Did you have any difficulty with Salmon after that? "A. After what? "Q. After your dealings with him in 1945? "A. Nothing at all. I simply kept dunning him for a release on the paper accumulations so that I could get my books in shape because I had to carry that accumulation there." In the light of the other facts of record herein, we construe this uncorroborated, self-serving testimony of Herman to be support for an ultimate finding that there were vague assurances to him by the lessors that at some indeterminate future time the lessors would consider favorably the adjustment of the debts representing accruals of unpaid rentals by cancellation in whole or in part, the time being when and if the lessors wished to repossess the leased premises. While such a cancellation did occur in 1949, we conclude that prior to this time the debt canceled was a valid debt. We now consider the question of the extent, if any, by which the cancellation of the transferor's debt in 1949 resulted in its solvency. The resolution of this question depends upon the value to the corporation of its account receivable at that date against Herman. In other words, we must ascertain *295 to the best of our ability from the unsatisfactory record before us how much, if anything, could have been realized on this claim by the transferor corporation at the time of the cancellation here in question. Herman contends that his only asset was the net cash surrender value of his life insurance policies, and that he had liabilities (other than that due to the corporation) of $51,999.20 owing to his wife. We disagree. It is our opinion that the intrafamily advances made by Nettie did not give rise to valid debts enforceable against Herman in 1949; and, further, that other assets would be available to the corporation in the collection of Herman's indebtedness to it. As of the end of 1942 Herman was indebted to the corporation on account of the advances made to him in an amount in excess of $38,000. Apparently this was his only indebtedness and the only asset which he retained in his own name was a life insurance policy with a net cash surrender value considerably less than this amount. Thus he was insolvent at that time and became increasingly so through the years 1943 to 1949, inclusive. However, during those years, he purchased in his wife's name or that of his daughter *296 furniture at a cost of over $24,000, jewelry at a cost of $1,100, an automobile at a cost of $2,825, a mink coat at a cost of $3,550, and a house at a cost of $30,000. These transactions were in effect fraudulent conveyances under sections 272 and 273 of the Debtor and Creditor Law of New York, and the property thereby acquired in the names of the wife and daughter was under a constructive trust for Herman's creditor, the corporation. Banister v. Solomon, 126 F. 2d 740. However, petitioners contend that the value of these assets as of 1949 was considerably less than their cost upon acquisition, asking us to determine such lesser value under the so-called Cohan rule in spite of the absence of specific testimony with regard to such value. We are unwilling to do so with regard to the mink coat and the real estate. We are not familiar with the mysteries incident to the value of mink coats. While petitioners' argument to the effect that a secondhand mink coat would be worth less in 1949 after some years of wear than it was in 1944 when it was purchased sounds plausible, it assumes matters not of record, for example, that it was purchased new at a retail price and that *297 the market price of mink coats did not fluctuate upward between 1944 and 1949. For much the same reason we are unable to follow petitioners' argument with regard to the 1949 value of the house. However, with regard to the furniture bought during the years 1943 to 1949, inclusive, and used by petitioners and their daughter, we think it so obvious that its market value in 1949 was less than its price when Herman paid for it that it would be proper to approximate its value in 1949 with reference to its price rather than to take the price paid as the amount of such value. Following the so-called Cohan rule and bearing most heavily against petitioners, upon whom is the burden of proof, we have approximated the value of the furniture in 1949 to be $18,000. Based on the same reasoning we have concluded that the automobile purchased in 1947 for $2,825 had a value in 1949 of $1,500. Respondent contends that the value of the house as an asset subject to the demands of Herman's creditors in 1949 should be diminished on account of the $18,000 mortgage thereon only to the extent of $8,000 representing the cash advanced to Nettie, the mortgagor, by petitioners' daughter, the mortgagee. The balance *298 of $10,000 represents the purchase price which Nettie agreed to pay to the daughter for her furniture, some of which, as respondent points out, was bought originally with Herman's funds and given to her by petitioners. Some of it also represented wedding presents from others and included paintings given to her by her grandfather. The circumstances of this rather unusual intrafamily transaction are strange enough to arouse suspicions as to its bona fides and reality. However, as respondent recognizes the validity of the mortgage in part and as it would be difficult to demonstrate the extent to which it might be considered invalid, we think that as a practical matter it would be impossible as of 1949 to conclude that the amount of Herman's equity in the residence property available to his creditor would be appreciably more than $12,000, the price paid for it less the existing mortgage. Considering that the assets of Herman and those held under constructive trusts for the benefit of his creditor had a value in 1949 of approximately $64,000 and discounting this figure slightly on account of the contingencies and expenses incident to potential litigation, we have concluded that the *299 corporation's account receivable from Herman had a value of $60,000 in 1949 when the debt was canceled and also in 1950 when it was distributed to Herman as a part of the corporation's de facto complete liquidation. Therefore we conclude that the petitioner corporation received income in 1949 by reason of the cancellation of its indebtedness to the extent that it was rendered solvent thereby, which from the record appears to be the sum of $61,307.09. Petitioners argue to the effect that there was no transfer of any asset by the corporation to Herman, pointing out that although there was a complete cessation of the corporation's business in 1950 and an appropriation by Herman of all of its appropriable assets there was no formal dissolution and no formal conveyance or release to him of the corporation's claim against him. It seems obvious to us that there was a de facto distribution in complete liquidation of the corporation made by it to Herman in 1950, and that by this distribution Herman became the distributee and transferee within the intendment of the Internal Revenue Code. See Hunn v. United States, 60 F. 2d 430. For the reasons explicit in our disposition of *300 the foregoing issues, we are of the opinion that Herman received a long-term capital gain by reason of the distribution to him of the corporation's claim against him by its de facto dissolution in 1950 pursuant to section 115(c) of the Internal Revenue Code of 1939. However, at the time he received it by reason of its distribution to him, it was subject to his transferee liability to the extent of the transferor's unpaid Federal income taxes as of December 31, 1950. The collectible value of his obligation to the corporation ($60,000) should be diminished by the amount of such unpaid taxes in determining the amount of the capital gain resulting to Herman from such distribution, and, of course, his basis with regard to the stock of the corporation should also be subtracted from the $60,000 in ascertaining the amount of his capital gain. As to this basis we are persuaded from the testimony and have so found that it is the sum of $16,000, rather than the $5,000 contended for by respondent. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Netley Service Corporation, Docket No. 58759, and Herman Levy and Nettie Levy, Docket No. 58760.↩
*. The figure "3,500.00" was deleted and the figure "3,500.60" was added by an official order of the Tax Court, dated February 23, 1960 and signed by Judge Kern.↩